201 P.3d 586

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Reginald FIELDS, Defendant–Appellant.**

No. 25455.

Intermediate Court of Appeals of Hawai'i.

May 31, 2005.

Certiorari Granted July 6, 2005.

Karen T. Nakasone, (Deborah L. Kim on the brief) Deputy Public Defenders, for Defendant–Appellant.

Tracy Murakami, (Jennifer S. Winn on the brief) Deputy Prosecuting Attorneys, County of Kauai, for Plaintiff–Appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Reginald Fields (Fields) appeals from the October 11, 2002 Judgment of the Family Court of the Fifth Circuit [1] finding him guilty of Abuse of Family and Household Members, Hawaii Revised Statutes (HRS) § 709–906 (Supp.2003), a misdemeanor, and sentencing him to probation for two years, and imprisonment for two days, with credit for time served. We affirm without prejudice to Fields' right to attempt to prove his right to post-conviction relief pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 40 (2004).

## BACKGROUND

On April 29, 2002, Plaintiff–Appellee State of Hawai'i (the State) filed a petition charging Fields with violating HRS § 709–906 by "intentionally, knowingly, or recklessly engag[ing] in and caus[ing] physical abuse of a family or household member," specifically his girlfriend Melinda Staggs (Melinda).

At the jury-waived trial on July 29, 2002, Melinda was the State's first witness. She testified that on April 13, 2002, she was living with Fields in the County of Kaua'i. The State then asked about the events that took

---

1. The Honorable Calvin K. Murashige presided.

place on the evening of April 13, 2002, and the following dialogue occurred:

Q. And you don't recall an incident that happened back in April where the police came over two times?

A. I have a hard time remembering....

....

Q. Do you recall talking to a police officer on April 13th just before midnight at where you were living?

A. No.

....

Q. Do you recall telling a police officer that on April 13th around 11:40 you and your boyfriend got into an argument?

A. No, I don't remember.

Q. Do you recall telling a police officer that you were lying chest down on the sofa in your living room?

A. No, I don't remember that.

Q. Do you recall telling a police officer that [Fields] came in behind you and started to push down on your neck with both of his hands?

A. No.

Q. Do you recall telling a police officer that this caused pain to your neck?

A. Nope.

Q. And do you recall telling a police officer that you could not breathe while he was holding you down?

A. No, I don't recall that.

Q. Do you recall—recall telling a police officer that [Fields] punched you once in the face causing pain to your face?

A. (No audible response.)

On cross-examination, Melinda recalled that her friend David Richards (Richards) was also present that evening, could not recall whether or not Richards attempted to hold her wrists to prevent her from slapping Fields, and recalled laying on Fields' surfboard and threatening to break it if Fields left that evening. To the question of whether the fact that she drank a lot of beer that night may have been the reason why she was unable to remember many of the details of that evening, she responded, "Perhaps."

The State's second witness was Karma Lhamo (Karma), the landlord of Fields and Melinda. When asked about the evening of April 13, 2002, she testified, in relevant part, as follows:

Q. How close are your homes?

A. The home that they rented from me is about, I would say, 100 feet or more away from where I live. Maybe 200.

....

Q. Was [sic] the police called that evening?

A. Yes, twice.

Q. Can you briefly describe what happened the first time?

A. I was in my bathroom, I heard a car pull up. I didn't see who was in the car, it was dark. There were several people in the car. Melinda was standing outside yelling for Karma. Says: Karma, Karma, can you please call the cops?

Q. And did the police come?

....

A. I would say about 15 minutes later.

Q. And how long were they there?

A. For a good two hours.

Q. And how many people had come in this car that you described?

A. Well, ... there's a total of four people in that car.

Q. And did the police escort everyone away?

A.... They took a taxi.... [T]hey were asked to take their car off of my property, and then they were asked to find another way home because they were all drunk....

Q. And who was escorted back to Melinda and [Field's] residence?

A. [Fields], Melinda, and they had company, [Richards], a friend of theirs.

Q. Now, after the officers left did you hear anything later that evening?

A. After I was escorted to my door or my walkway ..., I heard noise in their room, like somebody was being pushed or slapped or pushed to the ground. And at that point I called 911 again.

....

A. I was—I was in my bathroom and I heard somebody hit the ground with a hard [thud] or a wall or something. There were two people in that house at the time, [Fields] and his company [Richards]. And I don't know if they were arguing—I don't know what was going on there. They were arguing in that apartment and I heard somebody fall to the ground (indicating sound), like a hard [thud], like that. At that point I got afraid, I called 911, and they come over right away.

Q. And was Melinda in the residence?

A. She was there, she was kind of shook up, kind of scared and, I don't know, half beaten or something.

. . . .

A. I went to go over to see if she was okay cuz [sic] [Fields] and his company had left in his Suzuki. They left the property, and I guess Melinda was wanting to know if he was okay or not.

. . . .

Q. Did you notice any injuries to Melinda?

. . . .

A. I—yes. I'm pretty sure she was injured.

Q. Do you remember what kind of injury?

A. It was either a lip injury—a facial—it must have been a facial injury of some sort or something, a bodily injury, I believe.

Q. Did you hear any of the words that were being spoken while their—while you heard the arguing?

A. I think [Fields] and [Richards] were arguing, I don't know if they were arguing towards Melinda or with each other or maybe some—Melinda said something and [Fields] didn't like it or—see, the whole thing that happened there was—from what I had heard during the conversation there on the property was that they were going to go after [Fields], and Melinda was trying to provide some kind of support so they wouldn't attack him cuz [sic] he had some kind of operation, had a bag there on his left side and she was trying to protect him.

. . . .

Q. What did [Richards] say?

A. [Fields], get off her.

Defense counsel did not object to this testimony.

On cross-examination, Karma testified, in relevant part, as follows:

Q. [Karma], during this incident where these four people came over in a car, . . . you said that Melinda was . . . trying to protect [Fields], is that correct, . . . ?

. . . .

A. . . . [Y]es, she was pretty upset at the fact that they had showed [sic] up on [the] property.

Q. . . . [D]id you see an actual altercation, physical altercation?

A. Yes, sir.

. . . .

Q. Okay. And did you see [Melinda] get hit at that point?

A. Someone had come up from behind her with a stick, and at that point I was holding the phone trying to call 911.

Q. She—she did get hit outside?

A. I don't know if she got hit.

Q. Okay. Now, . . . you said there was a big thud or something like that?

A. Yes.

Q. And you thought that was somebody falling to the floor?

A. Yes.

. . . .

Q. Okay. You don't know whose body that was, but?

A. No.

. . . .

Q. Okay. And you said you heard slapping sounds?

A. I heard slapping sounds, that's correct.

Q. Again, you were not sure who was being slapped or who was the slapper and such?

A. Correct.

Police Officer Karen Kapua (Officer Kapua) then testified that she arrived at Melinda's residence at around 11:30 p.m., where

she came upon Melinda and Karma. Although Officer Kapua did not speak with Melinda, she did observe that Melinda "had a red mark on her chin and also a red scratch on her right shoulder."

Police Officer Elliot Ke (Officer Ke) was the final witness for the State. Officer Ke stated that he arrived at the residence at around 11:40 p.m. and interviewed Melinda in her living room. The following colloquy took place between the deputy prosecuting attorney (the Prosecutor) and Officer Ke:

Q. And did you ask [Melinda] what happened?

A. Yes, I did.

Q. What did she say?

A. She said that she and [Fields] got into [an] argument. [Fields] was upset. I guess her mom brought some friends over earlier in the evening and the police had to come by. They were upset so they were arguing. And she said she was laying down on the couch watching TV, and I guess [Fields] came up behind her and started holding her down, pressing on her neck with both of his hands, like, kind of holding her down on the couch. And then she also said that he punched her in the face, left side of her face, Melinda's face.

Q. Can you describe [Melinda's] appearance when you saw her?

A. .... [H]er clothes was [sic] torn at the front, ... her face was red on her left cheek ... and there were also abrasion [sic] on her chin and a scratch on her shoulder. She ... appeared to be intoxicated.

Defense counsel did not object to this testimony.

On cross-examination, Officer Ke testified as follows:

Q. She also didn't want to cooperate as far as filling out any statement, right?

A. Correct.

Q. Something about she wanted to talk with a lawyer first if she was doing the right thing?

A. Yes.

Q. And she didn't want to go to the women's shelter, right?

A. No, she did not.

At this point, the State rested its case.

Defense counsel then stated to the court that "in lieu of witness testimony, there's been an agreed stipulation that—to submit a report done by investigator Leon Gonsalves with the prosecutor's office [the Gonsalves Report] of a David Richards in this case. Like to submit that into evidence." The Prosecutor confirmed the agreement. The Gonsalves Report was a report of statements made by Richards during an interview on July 2, 2002. The Gonsalves Report states, in relevant part, as follows:

[Richards] says that [Fields] received a telephone call from [Melinda's] mother, Patsy PEPPER. According to [Richards] the phone message to [Fields] was that, "they were coming over to the house to kick his ass and Kill him". [Richards] remembers [Fields] hanging up the phone and this is when [Melinda] came home carrying some grocery bags. That [sic] [Richards] saw some headlights shining into the house and he told [Fields], "Get headlights, they coming". [Richards] saw [Fields] go outside with [Melinda] and it was dark and some other people came with Patsy PEPPER but [Richards] does not know whom they were.

[Richards] said that some punches were thrown, but he does not know who was doing what because it was dark outside. [Richards] saw the people drive off and [Melinda] and [Fields] went back into the house and that [sic] he followed them. [Richards] recalls seeing [Fields] and [Melinda] in the house but that [Fields] never physical[ly] assaulted [Melinda], he saw [Fields] just hold [Melinda's] wrist to keep her from hitting him, [Richards] said [Fields] never assaulted [Melinda]. . . . [Richards] said he did not see [Fields] hit [Melinda].

Fields then testified that he spent the afternoon of April 13, 2002 fishing with his friend Richards. After fishing, he and Richards went back to Fields' place to eat dinner and watch television. Fields stated that no one else was at home at the time.

Then the phone rang—[Richards] was sitting outside and the phone rang. I picked

up the phone and it was—Melinda had her own line and I had my own line. And I picked up Melinda's line and it was her mother. And she goes: What are you doing answering this phone? And in the background I hear: Yeah, we're going to come over and kick your ass. So I—they hung up the phone and I went out and told [Richards], I go: Oh, Patsy (phonetic) and her boys are going to come down to kick my ass. Why I don't know, yeah?

So then I went back in the house and I got my—like a juice or something like that. And Melinda came home, . . . .

. . . .

Oh, Melinda and [Richards] were sitting out on the front porch area. And then like about ten minutes later, here comes her mom driving like [a] wild nut down the road. And she's pulling in our yard, and Melinda ran out and told them: You get off the property and stuff. And the mom kept on driving onto it. And from then on, like, they parked the car and Melinda told them to go, leave the property.

And the front door came open, and Melinda and the guy in the front seat were hitting on each other. Then the mom came out with her cane and the other two guys come out too, right? And I for—I ran into it too, it was a big altercation, yeah? Like, Melinda was kicking and getting hit and punched and everything, so I jumped in and—it was a big fight. And then everybody came to a stop.

And then the neighbor next door, he goes: Hey, tell 'em to leave, tell 'em to leave. I told 'em to leave, they wouldn't leave, and the altercation started up again with Melinda and the guy in the front seat with the glasses.

And then the cops—the police officers came up and they asked if we wanted to press charges, and I said yeah. And [Richards] got whacked over [the] head too with the cane and stuff. But Melinda, it was her mother, so she goes: Oh, no, no, they were all drunk and everything like that, so. Then they left, you know, the police officers. I told 'em to arrest 'em, yeah? But they wouldn't. So they let 'em catch a cab home or something to the west

side, yeah? And they left the—they got the car off the property and parked it on the corner of the road.

And then after that I was going to take [Richards] home, yeah, cuz [sic] [Richards] goes: I want to get out of here, right? And Melinda was really drunk and stuff, and she started hitting on me from the back because she didn't want me to leave her there alone. . . .

. . . .

. . . I had a Suzuki jeep so only like two people can sit in it cuz [sic] my back was all full. And [Richards] wanted to go home so I just took—cuz [sic] he was going to spend the night, yeah? But after all this altercation started he decided to leave. And then that's when she started hitting me. You're not going to leave here and leave me here alone. She starts hitting on me. And [Richards is] grabbing her arms to stop hitting me, yeah? And then I go: Come on, [Richards], let's get out of here.

And then she went and kicked in the door in the back room and grabbed my surfboard, placed it on the couch in between that and the coffee table. And she goes: If you're going to leave I'm going to break your surfboard. You love this surfboard so much, watch this. And me and [Richards] just left. That's what happened.

While being cross-examined, Fields testified that Richards witnessed Melinda "hitting [Fields] and putting the surfboard down" and that, from the time following the altercation until he drove Richards home, Richards was in the house with him.

During redirect examination, Fields explained that at the time of the altercation, he could not have much physical activity because part of his intestines had been removed and he had a colostomy bag on his side. After Fields testified, the defense rested.

In her closing argument, the Prosecutor stated, in relevant part, as follows:

[Prosecutor]: Your Honor, [Karma] heard slapping sounds, something hitting the floor, and she heard arguing. She also heard [Richards] say: [Fields] get off of

her. Which corresponds with [Melinda's] initial statement to the police that [Fields] was on her holding her down.

[Melinda] also, according to both officers, had facial injuries, her left cheek was red and she also had a cut on her chin. Her demeanor, she was crying and shaken.

And, your Honor, the interview that Leon Gonsalves did with [Richards] indicates that [Richards] was extremely intoxicated, that he was recalling the incident outside, had little to say about the incident inside, apparently didn't mention anything about a surfboard or Melinda actually hitting [Fields].

The State believes that [Richards'] ... interview must be taken lightly in that [Melinda's] initial statements along with the corresponding interviews immediately at the time of the incident should be weighed heavily.

Defense counsel "submit[ted] on the evidence that's been presented."

The court orally decided, in relevant part, as follows:

The Court understands from the testimony that there were two instances—or incidents on the same day. The initial incident had to do with a carload of people coming to the residence where [Fields] and [Melinda] were living. And following that incident there was another incident about 11:30, 11:40 when the police were called as a result of the landlord hearing some sounds. Among the statements or sounds that the landlord heard was [the] statement of one person, believed to be [Richards], saying: [Fields], get off her.

The police officer observed the demeanor and condition of [Melinda]. Her clothes were torn in front, [her] cheek was red, there was [an] abrasion on her chin, [a] scratch on her shoulder. There were statements that [Fields] and [Melinda] had got [sic] into an argument because of the earlier incident involving the—when the police came over, and that [Fields] grabbed or came—came upon her from behind, held her down and struck her in the face.

Based upon what the Court has heard, [Fields], the Court will find that the [S]tate has proven its case beyond a reasonable doubt and will find you guilty of the offense.

The court's oral decision was formalized in the court's October 11, 2002 Judgment.

## POINTS OF ERROR

Both at trial and in this appeal, Fields was represented by the Office of the Public Defender. Although he did not do so at trial, Fields, on appeal, objects to the admission into evidence of two hearsay statements. The first is Officer Ke's hearsay testimony that

[Melinda] said she was laying down on the couch watching TV, and I guess [Fields] came up behind her and started holding her down, pressing on her neck with both of his hands, like, kind of holding her down on the couch. And then she also said that he punched her in the face, left side of her face, Melinda's face.

The second is Karma's hearsay testimony that Richards said, "[Fields], get off her."

Fields contends that (1) the receipt into evidence of Officer Ke's hearsay testimony, repeating what Melinda said, violated Fields' federal and state constitutional rights to confront Melinda and was plain error, (2) both hearsay statements were inadmissible hearsay evidence and the admission of them into evidence was plain error, and (3) plain error occurs when the prosecution relies "exclusively on hearsay, whether admissible or not, to meet its burden to establish the *corpus delicti* of the offense."

## DISCUSSION

A. Admission of Hearsay Statements Into Evidence.

At trial, what valid objections could Fields have made to the two hearsay statements?

1. Confrontation Clause, Federal Constitution, Pre–March 8, 2004.

In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United

States Supreme Court discussed a defendant's federal constitutional right to be "confronted with the witnesses against him" and concluded that

> [t]he Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant....
>
> The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule." *Snyder v. Massachusetts,* 291 U.S., [97,] 107, 54 S.Ct., [330,] 333 [78 L.Ed. 674] [ (1934) ]....
>
> ....
>
> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.
>
> ....
>
> The basic litmus of Sixth Amendment unavailability is established: "[A] witness is not 'unavailable' for purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial." *Barber v. Page,* 390 U.S.,

[719,] 724–725, 88 S.Ct., [1318,] 1322 [20 L.Ed.2d 255] [ (1968) ] (emphasis added). Accord, *Mancusi v. Stubbs, supra* [408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972) ]; *California v. Green,* 399 U.S., at 161–162, 165, 167, n. 16, 90 S.Ct., at 1936–1937, 1938–1939, n. 16; *Berger v. California,* 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969).

> Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *California v. Green,* 399 U.S., at 189, n. 22, 90 S.Ct., at 1951 (concurring opinion, citing *Barber v. Page, supra* ). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.

*Roberts,* 448 U.S. at 65–66, 74–75, 100 S.Ct. at 2538–39, 2543 (footnotes omitted).

### 2. Confrontation Clause, Hawai'i Constitution.[2]

In *State v. Haili,* 103 Hawai'i 89, 79 P.3d 1263 (2003), the Hawai'i Supreme Court stated, in relevant part, as follows:

> [Haili] argues that the circuit court erred by admitting hearsay testimony in violation of [Hawaii Rules of Evidence (HRE) ] Rule 804(b)(5) and the confrontation clauses of the United States and Hawai'i Constitutions. Although the circuit court ruled correctly in admitting this testimony for purposes of the hearsay rules,

---

**2.** In pertinent part, Article I, Section 14 of The Constitution of the State of Hawai'i states: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against the accused[.]"

the court erred in admitting the testimony in violation of [Haili]'s constitutional right to confront adverse witnesses. This error was not harmless beyond a reasonable doubt.

. . . .

Article I, section 14 of the Hawai'i Constitution and the sixth amendment to the United States Constitution guarantee criminal defendants the right to confront and cross-examine adverse witnesses. *State v. Moore,* 82 Hawai'i 202, 222, 921 P.2d 122, 142 (1996). However, this right is not absolute: the prosecution may present hearsay testimony adverse to the defendant in certain circumstances, because of the "societal interest in accurate fact-finding, which may require consideration of out-of-court statements." *State v. McGriff,* 76 Hawai'i 148, 156, 871 P.2d 782, 790 (1994) (quoting *Bourjaily v. United States,* 483 U.S. 171, 182, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)) (block quote format omitted). *In State v. Sua,* 92 Hawai'i 61, 987 P.2d 959 (1999), this court reiterated that hearsay testimony must meet a two-part test so as not to violate a defendant's constitutional rights:

> This court has repeatedly followed the test established in [*Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) ], recognizing that the confrontation clause restricts the range of admissible hearsay in two ways. First, the prosecution must either produce, or demonstrate the unavailability of, a declarant whose statement it wishes to use against a defendant. Second, upon a showing that the witness is unavailable, only statements that bear adequate indicia of reliability are admissible.

*Sua,* 92 Hawai'i at 71, 987 P.2d at 969 (quoting *State v. Ortiz,* 74 Haw. 343, 361, 845 P.2d 547, 555-56 (1993)). All of the hearsay statements made by [victim] obviously satisfy the first prong of this test. However, as discussed below, the statements do not bear adequate indicia of reliability.

a. *Adequate indicia of reliability*

In *Idaho v. Wright,* 497 U.S. 805, 816-17, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990),

the United States Supreme Court held that the prosecution must demonstrate the reliability of hearsay testimony by proving either: (1) that the proffered hearsay testimony is within a traditionally rooted hearsay exception; or (2) that the proffered hearsay testimony has particular guarantees of trustworthiness. The hearsay testimony in the instant case does not satisfy this test.

i. **Traditionally rooted hearsay exception**

Neither HRE Rule 804(b)(5) nor HRE Rule 804(b)(8) is a traditionally rooted hearsay exception. HRE Rule 804(b)(5) does not have a counterpart in the Federal Rules of Evidence and is not widely accepted. *State v. Ross,* 122 N.M. 15, [21-22,] 919 P.2d 1080, 1086-87 (1996). HRE Rule 804(b)(8) is likewise not a firmly rooted hearsay exception. *See Wright,* 497 U.S. at 817, 110 S.Ct. [at 3147] (holding that Idaho's residual hearsay exception, Idaho Rules of Evidence (IRE) Rule 803(24), was not a firmly rooted hearsay exception). The United States Supreme Court explained:

> Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements. The residual hearsay exception, by contrast, accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial.

*Wright,* 497 U.S. at 817, 110 S.Ct. [at 3147] (citations omitted).

ii. **Particular guarantees of trustworthiness**

The United States Supreme Court held that particular guarantees of trustworthiness should be judged by examining the totality of the circumstances surrounding each of the proffered hearsay statements. *Wright,* 497 U.S. at 819, 110 S.Ct. [at 3148-49]. However, both this court and the United States Supreme Court have held

that courts may not rely upon corroborating evidence from other parts of the trial to support a finding of trustworthiness. *Wright*, 497 U.S. at 822–23, 110 S.Ct. [at 3150–51]; *Sua*, 92 Hawai'i at 72 n. 5, 987 P.2d at 970 n. 5. The United States Supreme Court rejected a mechanical test for determining whether a statement is trustworthy, instead noting that trustworthiness is inversely related to the usefulness of cross-examination: "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Wright*, 497 U.S. at 820–22, 110 S.Ct. [at 3149–50]. Simply because evidence is admissible under the catchall rule does not mean that the evidence is trustworthy enough to satisfy the confrontation clause. *United States v. Mokol*, 939 F.2d 436, 439 (7th Cir.1991). However, the United States Supreme Court has sought to construe the confrontation clause pragmatically, recognizing that "every jurisdiction has a strong interest in effective law enforcement." *Ohio v. Roberts*, 448 U.S. 56, 64, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *See also Sua*, 92 Hawai'i at 63, 74, 987 P.2d at 961, 972 (admitting hearsay testimony under the past recollection recorded exception and noting that the testimony was reliable because: (1) the declarant had given the testimony under oath; (2) as the victim, the declarant had personal knowledge of relevant facts; (3) the declarant was not reluctant to implicate the defendant during the grand jury proceedings; (4) the declarant did not have a relationship with the government, such that he would not have benefitted from fabricating testimony implicating the defendant; and (5) the declarant never recanted his testimony).

Examining the totality of circumstances in the instant case does not yield a clear result. The statements appear trustworthy because [victim] never recanted her statements and made them to individuals who probably would have supported [victim]'s decision to divorce [Haili] regardless of the existence of abuse. However, none of [victim]'s statements was made under oath, and [victim] could have benefitted from these statements by garnering sympathy and support from her friends and family.

We hold that the circuit court erred in admitting [victim]'s statements to [other witnesses] that [Haili] was threatening to kill her. The court also erred in admitting [victim]'s statements to [other witnesses] that [Haili] was abusing her.

To be admissible, the court must have some reason to believe that the declarant's hearsay statements are particularly trustworthy. See, *e.g., United States v. Doerr*, 886 F.2d 944, 955–56 (7th Cir.1989) (witness's grand jury testimony sufficiently trustworthy where testimony was given under oath subject to penalty for perjury; witness had been explicitly informed that he had a constitutional right not to answer any questions and witness was not pressured to testify); *Steinberg v. Obstetrics–Gynecological & Infertility Group, P.C.*, 260 F.Supp.2d 492, 496 (D.Conn.2003) (hearsay within hearsay statements in letter from plaintiff's former attorney to plaintiff's current attorney were admissible under residual exception to hearsay rule because there was "no reason why [the former attorney] would have been motivated to fabricate or convey any inaccurate information to [the current attorney]"). But because we cannot rely upon corroborating circumstances to justify admission of the testimony, we cannot consider the fact that [Haili] actually did kill [victim] in determining whether her recitation of threats was particularly trustworthy. Similarly, we cannot utilize the fact that [victim] told several individuals, at different times, that her life was in danger to bootstrap the admission of all these statements. Each statement must be independently trustworthy without regard to other supporting statements. In the instant case, there is nothing intrinsic to [victim]'s statements to uphold the circuit court's determination that they were particularly trustworthy. The statements were not made under oath; they were not made to law enforcement personnel; they were not made to an attorney or other officer of the

courts; they were not made to a domestic violence counselor; they were not made to a teacher or employer; and they were not made to a therapist or religious figure. In short, the statements were not made under circumstances demonstrating particular guarantees of trustworthiness, which is a stricter standard than the trustworthiness standard for admission under the hearsay rules. Therefore, the circuit court erred in admitting the hearsay testimony.

*Haili*, 103 Hawai'i at 101, 103–05, 79 P.3d at 1275, 1277–79 (footnotes omitted).

### 3. Confrontation Clause, Federal Constitution, Commencing March 8, 2004.

Under *Roberts* and *Haili*, two of the three Confrontation Clause requirements for the introduction of a pre-trial testimonial statement into evidence are that the witness (1) "did not appear at trial" and (2) was "unavailable[.]" In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court amended its *Roberts* test and concluded that the Sixth Amendment Confrontation Clause does not allow "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 124 S.Ct. at 1365.

### 4. The Meaning of "did not appear at trial."

If the witness physically appears at the trial and testifies, does the witness's lack of memory at the trial about the pre-trial testimonial statement authorize conclusions that the witness "did not appear at trial[,]" was "unavailable[,]" and that the defendant did not have a prior opportunity for cross-examination? In light of the precedent of *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), quoted in relevant part as follows, the answer is no.

> This case requires us to determine whether either the Confrontation Clause of the Sixth Amendment or Rule 802 of the Federal Rules of Evidence bars testimony concerning a prior, out-of-court identifica-

tion when the identifying witness is unable, because of memory loss, to explain the basis for the identification.

. . . .

## II

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." This has long been read as securing an adequate opportunity to cross-examine adverse witnesses. See, *e.g.*, *Mattox v. United States*, 156 U.S. 237, 242–243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895); *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). This Court has never held that a Confrontation Clause violation can be founded upon a witness' loss of memory, but in two cases has expressly left that possibility open.

In *California v. Green*, 399 U.S. 149, 157–164, 90 S.Ct. 1930, 1934–38, 26 L.Ed.2d 489 (1970), we found no constitutional violation in the admission of testimony that had been given at a preliminary hearing, relying on (as one of two independent grounds) the proposition that the opportunity to cross-examine the witness at trial satisfied the Sixth Amendment's requirements. We declined, however, to decide the admissibility of the same witness' out-of-court statement to a police officer concerning events that at trial he was unable to recall. In remanding on this point, we noted that the state court had not considered, and the parties had not briefed, the possibility that the witness' memory loss so affected the petitioner's right to cross-examine as to violate the Confrontation Clause. *Id.*, at 168–169, 90 S.Ct., at 1940–41. Justice Harlan, in a scholarly concurrence, stated that he would have reached the issue of the out-of-court statement, and would have held that a witness' inability to "recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence." *Id.*, at 188, 90 S.Ct., at 1951.

In *Delaware v. Fensterer*, 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)(*per curiam* ), we determined that there was no Confrontation Clause violation when an expert witness testified as to what opinion he had formed, but could not recollect the basis on which he had formed it. We said:

"The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Id.,* at 21–22, 106 S.Ct., at 295.

Our opinion noted that a defendant seeking to discredit a forgetful expert witness is not *without* ammunition, since the jury may be persuaded that "his opinion is as unreliable as his memory." *Id.,* at 19, 106 S.Ct., at 294. We distinguished, however, the unresolved issue in *Green* on the basis that that involved the introduction of an out-of-court statement. 474 U.S., at 18, 106 S.Ct., at 294. Justice STEVENS, concurring in the judgment, suggested that the question at hand was in fact quite close to the question left open in *Green.* 474 U.S., at 23–24, 106 S.Ct., at 296.

Here that question is squarely presented, and we agree with the answer suggested 18 years ago by Justice Harlan. "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Kentucky v. Stincer,* 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987), quoting *Fensterer, supra,* 474 U.S., at 20, 106 S.Ct., at 294 (emphasis added); *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Ohio v. Roberts,* 448 U.S. 56, 73, n. 12, 100 S.Ct. 2531, 2543, n. 12, 65 L.Ed.2d 597 (1980). As *Fensterer* demonstrates, that opportunity is not denied when a witness testifies as to his current belief but is unable to recollect

the reason for that belief. It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination, see 3A J. Wigmore, Evidence § 995, pp. 931–932 (J. Chadbourn rev.1970)) the very fact that he has a bad memory. If the ability to inquire into these matters suffices to establish the constitutionally requisite opportunity for cross-examination when a witness testifies as to his current belief, the basis for which he cannot recall, we see no reason why it should not suffice when the witness' past belief is introduced and he is unable to recollect the reason for that past belief. In both cases the foundation for the belief (current or past) cannot effectively be elicited, but other means of impugning the belief are available. Indeed, if there is any difference in persuasive impact between the statement "I believe this to be the man who assaulted me, but can't remember why" and the statement "I don't know whether this is the man who assaulted me, but I told the police I believed so earlier," the former would seem, if anything, more damaging and hence give rise to a greater need for memory-testing, if that is to be considered essential to an opportunity for effective cross-examination. We conclude with respect to this latter example, as we did in *Fensterer* with respect to the former, that it is not. The weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-examination is not the constitutional guarantee. They are, however, realistic weapons, as is demonstrated by defense counsel's summation in this very case, which emphasized Foster's memory loss and argued that his identification of respondent was the result of the suggestions of people who visited him in the hospital.

Our constitutional analysis is not altered by the fact that the testimony here involved an out-of-court identification that would traditionally be categorized as hearsay. See Advisory Committee's Notes on

Fed. Rule Evid. 801(d)(1)(C), 28 U.S.C.App., p. 717. This Court has recognized a partial (and somewhat indeterminate) overlap between the requirements of the traditional hearsay rule and the Confrontation Clause. See *Green,* 399 U.S., at 155–156, 90 S.Ct., at 1933–34; *id.,* at 173, 90 S.Ct., at 1943 (Harlan, J., concurring). The dangers associated with hearsay inspired the Court of Appeals in the present case to believe that the Constitution required the testimony to be examined for "indicia of reliability," *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970), or "particularized guarantees of trustworthiness," *Roberts, supra,* at 66, 100 S.Ct., at 2539. We do not think such an inquiry is called for when a hearsay declarant is present at trial and subject to unrestricted cross-examination. In that situation, as the Court recognized in *Green,* the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements. 399 U.S., at 158–161, 90 S.Ct., at 1935–36. We do not think that a constitutional line drawn by the Confrontation Clause falls between a forgetful witness' live testimony that he once believed this defendant to be the perpetrator of the crime, and the introduction of the witness' earlier statement to that effect.

Respondent has argued that this Court's jurisprudence concerning suggestive identification procedures shows the special dangers of identification testimony, and the special importance of cross-examination when such hearsay is proffered. See, *e.g., Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Respondent has not, however, argued that the identification procedure used here was in any way suggestive. There does not appear in our opinions, and we decline to adopt today, the principle that, because of the mere possibility of suggestive procedures, out-of-court statements of identification are inherently less reliable than other out-of-court statements.

## III

Respondent urges as an alternative basis for affirmance a violation of Federal Rule of Evidence 802, which generally excludes hearsay. Rule 801(d)(1)(C) defines as not hearsay a prior statement "of identification of a person made after perceiving the person," if the declarant "testifies at the trial or hearing and is subject to cross-examination concerning the statement." The Court of Appeals found that Foster's identification statement did not come within this exclusion because his memory loss prevented his being "subject to cross-examination concerning the statement." Although the Court of Appeals concluded that the violation of the Rules of Evidence was harmless (applying for purposes of that determination a "more-probable-than-not" standard, rather than the "beyond-a-reasonable-doubt" standard applicable to the Confrontation Clause violation, see *Delaware v. Van Arsdall,* 475 U.S., at 684, 106 S.Ct., at 1438), respondent argues to the contrary.

It seems to us that the more natural reading of "subject to cross-examination concerning the statement" includes what was available here. Ordinarily a witness is regarded as "subject to cross-examination" when he is placed on the stand, under oath, and responds willingly to questions. Just as with the constitutional prohibition, limitations on the scope of examination by the trial court or assertions of privilege by the witness may undermine the process to such a degree that meaningful cross-examination within the intent of the Rule no longer exists. But that effect is not produced by the witness' assertion of memory loss—which, as discussed earlier, is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement. Rule 801(d)(1)(C), which specifies that the cross-examination need only "concer[n] the statement," does not on its face require more.

This reading seems even more compelling when the Rule is compared with Rule 804(a)(3), which defines "[u]navailability as a witness" to include situations in which a

declarant "testifies to a lack of memory of the subject matter of the declarant's statement." Congress plainly was aware of the recurrent evidentiary problem at issue here—witness forgetfulness of an underlying event—but chose not to make it an exception to Rule 801(d)(1)(C).

The reasons for that choice are apparent from the Advisory Committee's Notes on Rule 801 and its legislative history. The premise for Rule 801(d)(1)(C) was that, given adequate safeguards against suggestiveness, out-of-court identifications were generally preferable to courtroom identifications. Advisory Committee's Notes on Rule 801, 28 U.S.C.App., p. 717. Thus, despite the traditional view that such statements were hearsay, the Advisory Committee believed that their use was to be fostered rather than discouraged. Similarly, the House Report on the Rule noted that since, "[a]s time goes by, a witness' memory will fade and his identification will become less reliable," minimizing the barriers to admission of more contemporaneous identification is fairer to defendants and prevents "cases falling through because the witness can no longer recall the identity of the person he saw commit the crime." H.R.Rep. No. 94–355, p. 3 (1975). See also S.Rep. No. 94–199, p. 2 (1975), U.S.Code Cong. & Admin.News, 1975, pp. 1092, 1094. To judge from the House and Senate Reports, Rule 801(d)(1)(C) was in part directed to the very problem here at issue: a memory loss that makes it impossible for the witness to provide an in-court identification or testify about details of the events underlying an earlier identification.

Respondent argues that this reading is impermissible because it creates an internal inconsistency in the Rules, since the forgetful witness who is deemed "subject to cross-examination" under 801(d)(1)(C) is simultaneously deemed "unavailable" under 804(a)(3). This is the position espoused by a prominent commentary on the Rules, see 4 J. Weinstein & M. Berger, Weinstein's Evidence 801–120 to 801–121, 801–178 (1987). It seems to us, however, that this is not a substantive inconsistency, but only a semantic oddity resulting from the fact that Rule 804(a) has for conven-ience of reference in Rule 804(b) chosen to describe the circumstances necessary in order to admit certain categories of hearsay testimony under the rubric "Unavailability as a witness." These circumstances include not only absence from the hearing, but also claims of privilege, refusals to obey a court's order to testify, and inability to testify based on physical or mental illness or memory loss. Had the rubric instead been "unavailability as a witness, memory loss, and other special circumstances" there would be no apparent inconsistency with Rule 801, which is a definition section excluding certain statements entirely from the category of "hearsay." The semantic inconsistency exists not only with respect to Rule 801(d)(1)(C), but also with respect to the other subparagraphs of Rule 801(d)(1). It would seem strange, for example, to assert that a witness can avoid introduction of testimony from a prior proceeding that is inconsistent with his trial testimony, see Rule 801(d)(1)(A), by simply asserting lack of memory of the facts to which the prior testimony related. See *United States v. Murphy,* 696 F.2d 282, 283–284 (C.A.4 1982), cert. denied, 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). But that situation, like this one, presents the verbal curiosity that the witness is "subject to cross-examination" under Rule 801 while at the same time "unavailable" under Rule 804(a)(3). Quite obviously, the two characterizations are made for two entirely different purposes and there is no requirement or expectation that they should coincide.

For the reasons stated, we hold that neither the Confrontation Clause nor Federal Rule of Evidence 802 is violated by admission of an identification statement of a witness who is unable, because of a memory loss, to testify concerning the basis for the identification. The decision of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*Owens,* 484 U.S. at 555–64, 108 S.Ct. at 840–45 (footnote omitted).

The historical record also supports a second proposition: that the Framers

would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination. The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts. Rather, the "right ... to be confronted with the witnesses against him," Amdt. 6, is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding. See *Mattox v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 39 L.Ed. 409 (1895); cf. *Houser*, 26 Mo., at 433–435. As the English authorities above reveal, the common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations. The numerous early state decisions applying the same test confirm that these principles were received as part of the common law in this country.

*Crawford*, 124 S.Ct. at 1365–66 (footnote omitted). "Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 1369.

Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. See *California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). It is therefore irrelevant that the reliability of some out-of-court statements " 'cannot be replicated, even if the declarant testifies to the same matters in court.' " *Post*, at 1377 (quoting *United States v. Inadi*, 475 U.S. 387, 395, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)).

The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it. (The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).)

*Id.* at 1369 n. 9.

### 5. Melinda's Statement.

#### (a) Federal Constitution

■ Melinda testified at the trial. In light of the precedent of *Owens*, quoted above, and notwithstanding the fact that she could not remember the incident, nor could she remember telling the police officer anything about it, the record compels the finding that Melinda appeared at trial and testified. The record further compels the conclusion that if counsel for Fields had objected to the introduction of Melinda's prior testimonial statement into evidence on the ground that it violated the right guaranteed to Fields by the confrontation clause in the federal constitution, the objection would have lacked merit and could validly have been denied.

#### (b) Hawai'i Constitution

When applying the Hawai'i Constitution, *Haili*, 103 Hawai'i 89, 79 P.3d 1263 (2003), not *Crawford*, 541 U.S. 36, 124 S.Ct. 1354, (March 8, 2004), is the applicable precedent. *Haili* applies the rule of *Roberts*. If counsel for Fields had objected to the introduction of Melinda's prior testimonial statement into evidence on the ground that it violated the right guaranteed to Fields by the confrontation clause in the Hawai'i constitution, the objection would have lacked merit and could validly have been denied.

#### (c) Hawaii Rules of Evidence [3]

■ Officer Ke's testimony, repeating what Melinda said, is hearsay under HRE

---

**3.** Hawaii Rules of Evidence (HRE), Chapter 626, Hawaii Revised Statutes (HRS) (1993) and (Supp.2003), states, in relevant part, as follows:

 **Rule 801 Definitions.** The following definitions apply under this article:

"Declarant" is a person who makes a statement.

"Hearsay" is a statement, other than one made by the declarant while testifying at the

trial or hearing, offered in evidence to prove the truth of the matter asserted.

"Statement" is an oral assertion, an assertion in a writing, or nonverbal conduct of a person, if it is intended by the person as an assertion.

**Rule 802 Hearsay rule.** Hearsay is not admissible except as provided by these rules, or by other rules prescribed by the Hawaii supreme court, or by statute.

**Rule 802.1 Hearsay exception; prior statements by witnesses.** The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:

(1) Inconsistent statement. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, the statement is inconsistent with the declarant's testimony, the statement is offered in compliance with rule 613(b), and the statement was:

 (A) Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition; or

 (B) Reduced to writing and signed or otherwise adopted or approved by the declarant; or

 (C) Recorded in substantially verbatim fashion by stenographic, mechanical, electrical, or other means contemporaneously with the making of the statement;

(2) Consistent statement. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, the statement is consistent with the declarant's testimony, and the statement is offered in compliance with rule 613(c);

(3) Prior identification. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, and the statement is one of identification of a person made after perceiving that person; or

(4) Past recollection recorded. A memorandum or record concerning a matter about which the witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

**Rule 803 Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(a) Admissions.

 . . . .

(b) Other exceptions.

(1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter.

(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

 . . . .

(24) Other exceptions. A statement not specifically covered by any of the exceptions in this paragraph (b) but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (B) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

**Rule 804 Hearsay exceptions; declarant unavailable.** (a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant:

(1) Is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement;

(2) Persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;

(3) Testifies to a lack of memory of the subject matter of the declarant's statement;

(4) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) Is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance by process or other reasonable means.

A declarant is not unavailable as a witness if the declarant's exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of the declarant's statement for the purpose of preventing the witness from attending or testifying. Determination of unavailability as a witness pursuant to this rule does not affect the opponent's right, under rule 806, to call and to cross-examine the declarant con-

Rule 801 (Supp.2003). According to HRE Rule 804(a)(3), Melinda was unavailable to testify.[4] Thus, the question is whether Me-

cerning the subject matter of any statement received in accordance with this rule.

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony . . . ;

(2) Statement under belief of impending death . . . ;

(3) Statement against interest . . . ;

(4) Statement of personal or family history . . . ;

(5) Statement of recent perception . . . ;

(6) Statement by child . . . ;

(7) Forfeiture by wrongdoing . . . ;

(8) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (B) the general purposes of these rules and the interests of justice will best be admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

**Rule 806 Attacking and supporting credibility of declarant.** When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

4. In *State v. Canady*, 80 Hawai'i 469, 911 P.2d 104 (App.1996) this court stated, in relevant part, as follows:

Unlike the contrasting language of FRE [Federal Rules of Evidence] Rules 801(d)(1)(C) and 804(a)(3) that the *Owens* Court relied on, the "inconsistent statement" provision of HRE Rule 802.1(1) and the "lack of memory" provision of HRE Rule 804(a)(3) are not significantly distinguishable. HRE Rule 804(a)(3) employs the same "subject matter" language as

HRE Rule 802.1(1), stating that a witness is unavailable if the witness "[t]estifies to a lack of memory of *the subject matter* of the declarant's statement[.]" HRE Rule 804(a)(3) (emphasis added).

Although the commentary to HRE Rule 802.1 is not evidence of legislative intent, it is "an aid in understanding" the rule. HRE Rule 102.1. The commentary to HRE Rule 802.1 explains that under the common law, prior inconsistent statements were considered hearsay and could only be used to impeach a witness. Commentary to HRE Rule 802.1 (1993). The FRE modified the common-law rule and allowed prior inconsistent statements to be used as substantive proof of the matters asserted in the statement, if the statement was " 'given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition[.]' " *Id.* (quoting FRE Rule 801(d)(1)(A)). HRE Rule 802.1 adopted this federal exception to the common law, and went further by adding two more exceptions to the hearsay objection for signed or adopted statements and recorded statements. *Id.* These exceptions were justified if the statements' trustworthiness was assured on two grounds: (1) the statements could "fairly be attributed" to the witness; and (2) the witnesses themselves were "subject to cross examination concerning the subject matter of the statement." *Id.*

The situation envisioned is one where the witness has testified about an event and his [or her] prior written statement also describes that event but is inconsistent with his [or her] [present] testimony. Since the witness can be cross-examined about the event and the statement, the trier of fact is free to credit his [or her] present testimony or his [or her] prior statement in determining where the truth lies.

*Id.* Consequently, the rule was intended to exclude the prior statements of a witness who could no longer remember the underlying events described in the statement. *See id.* Absent the opportunity to cross-examine a witness about the material events described in a prior statement, the statement would lack one of the twin guarantees of trustworthiness supporting its admissibility as *substantive* evidence of the matters asserted in the statement.

Hence, unlike FRE Rule 801(d)(1), HRE Rule 802.1(1) requires more of the witness than just that he or she be "placed on the stand, under oath and respond[ ] willingly to questions." *Owens*, 484 U.S. at 561, 108 S.Ct. at 844. We hold that HRE Rule 802.1(1) requires, as a guarantee of the trustworthiness of a prior inconsistent statement, that the witness be subject to cross-examination about the subject matter of the prior statement, that is, that the witness be capable of testifying substantive-

linda's statement is admissible under one of the exceptions listed in HRE Rule 804(b). The only possibility is HRE Rule 804(b)(8), and Melinda's statement is not admissible under it because (a) the record does not show that the State complied with the notice requirements of HRE Rule 804, and (b) Melinda's statement lacks the required "equivalent circumstantial guarantees of trustworthiness[.]" Therefore, if counsel for Fields had objected to the introduction of Melinda's prior testimonial statement into evidence on the ground that it violated the HRE, the objection would have had merit and could not have been validly denied.

### 6. Karma's Statement

### Hawai'i Rules of Evidence

 Karma's testimony, repeating what Richards said, is hearsay under HRE Rule

> ly about the event, allowing the trier of fact to meaningfully compare the prior version of the event with the version recounted at trial before the statement would be admissible as substantive evidence of the matters stated therein.
> Here, the subject matter of the Statement referred to the identity of Complainant's assailant and how Complainant sustained her injuries. At trial, Complainant testified that she could not recall the events that she allegedly described in the Statement. She was, therefore, not able to testify about the substantive events reported in the Statement. Because the witness could not be "cross-examined about the event[s,]" the trier of fact was not "free to credit the present testimony or the prior statement" to determine "where the truth [lay]." Commentary to HRE Rule 802.1. Accordingly, under the present state of the record, the Statement was not admissible under HRE Rule 802.1(1) because Complainant could not be "subject[ed] to cross examination concerning the subject matter of the statement" as "envisioned" under the Rule. *Id.*
> *Canady,* 80 Hawai'i at 479–81, 911 P.2d at 114–16 (footnotes omitted).

**5.** A defendant who is convicted and contends that he has thereby been victimized by the ineffective assistance of his trial counsel must decide whether to initiate that challenge (1) by a motion for a new trial, pursuant to HRPP Rule 33 (2004), (2) in his direct appeal, or (3) in a post-conviction proceeding, pursuant to HRPP Rule 40 (2004). When making this decision, defense counsel and defendant must be aware of and comply with the following precedent:

> Petitioner asserts that his prior counsel failed to present the issue of a potential viola-

801. Richards did not testify at trial. The record does not answer the question whether Richards was or was not unavailable to testify. Absent an affirmative answer to that question, if counsel for Fields had objected to the introduction of Richard's prior testimonial statement into evidence on the ground that it violated the HRE, the objection would have had merit and could not have been validly denied.

### B. The Two Possibilities.

 In light of the record, we conclude that the two hearsay statements that could have been validly objected to and excluded from evidence, pursuant to the HRE, present the possibilities that Fields is the victim of (a) the ineffective assistance of trial counsel [5] or (b) the trial court's plain error.

> tion of his constitutional right to trial by jury at trial and on appeal. First, any complaint of counsel's ineffective assistance *at trial,* contained in a Rule 40 petition, is usually waived pursuant to HRPP 40(a)(3), which states:
> > *Inapplicability.* Said proceeding shall not be available and relief thereunder shall not be granted where the issues sought to be raised have been previously ruled upon or waived. An issue is waived if the petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or any other proceeding actually conducted, or in a prior proceeding actually initiated under this rule, and the petitioner is unable to prove the existence of extraordinary circumstances to justify his failure to raise the issue. There is a rebuttable presumption that a failure to appeal a ruling or to raise an issue is a knowing and understanding failure.
> > Where petitioner has been represented by the same counsel both at trial and on direct appeal, no waiver of the issue of trial counsel's performance occurs because no realistic opportunity existed to raise the issue on direct appeal. *Matsuo v. State,* 70 Haw. 573, 577, 778 P.2d 332, 334 (1989)(Rule 40 petitioner's claim of ineffective assistance of trial counsel was not waived where his trial counsel failed to perfect appeal); *McBride v. State,* 595 N.E.2d 260 (Ind.App.1992). The issue of ineffective assistance of *appellate* counsel is also properly before us, as it could not have been raised until after the conclusion of the appeal. *Bryant v. State,* 6 Haw.App. 331, 335, 720 P.2d 1015, 1019 (1986).
> *Briones v. State,* 74 Haw. 442, 459–60, 848 P.2d 966, 975 (1993).

## C. The Possibility Asserted by Fields.

At trial, Fields was, and on appeal Fields is, represented by the Office of the Public Defender. For a reason that is obvious, appellate counsel for Fields does not contend that Fields is the victim of the ineffective assistance of his trial counsel. Appellate counsel for Fields contends that Fields is the victim of the trial court's plain error.

## D. What Error is Plain Error?

Hawaii Revised Statutes § 641–16 (Supp. 2003) states, in relevant part, as follows:

**Judgment; no reversal when.** The supreme court, or the intermediate appellate court, as the case may be, may affirm, reverse, or modify the order, judgment, or sentence of the trial court in a criminal matter. It may enter such order, judgment, or sentence, or may remand the case to the trial court for the entry of the same or for such other or further proceedings, as in its opinion the facts and law warrant. It may correct any error appearing on the record.

. . . .

. . . Except as otherwise provided by the rules of court, there shall be no reversal for any alleged error in the admission or rejection of evidence or the giving of or refusing to give an instruction to the jury unless such alleged error was made the subject of an objection noted at the time it was committed or brought to the attention of the court in another appropriate manner.

Hawaii Rules of Evidence, Rule 103 (1993), states, in relevant part, as follows:

**Rulings on evidence.** (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

(b) Record of offer and ruling. The court may add any other or further statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. It may direct the making of an offer in question and answer form.

. . . .

(d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

Hawai'i Rules of Penal Procedure, Rule 52 (2004) states as follows:

**HARMLESS ERROR AND PLAIN ERROR.**

(a) **Harmless error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

(b) **Plain error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

With respect to a similar federal rule, the United States Supreme Court has concluded that

before an appellate court can correct an error not raised at trial, there must be (1) "error," (2) that is "plain," and (3) that "affects substantial rights." If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."

*Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997) (citations, brackets, and internal quotation marks omitted). In *State v. Vanstory,* 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) and *State v. Staley,* 91 Hawai'i 275, 282, 982 P.2d 904, 911 (1999), the Hawai'i Supreme Court agreed with this conclusion.

### E. The Question and Answer in this Case.

■ In cases where the same counsel has represented the defendant/appellant both at trial and on direct appeal, and defendant/appellant, as reasonably expected, does not in his direct appeal contend that he is the victim of his trial counsel's negligent failure to object to the admission of two hearsay statements into evidence, may defendant/appellant in his direct appeal avoid the issue of whether his trial counsel was ineffective by asserting that the court's admission of the two hearsay statements into evidence was the court's plain error?

■ To answer the question of whether the court's admission of the two hearsay statements into evidence was the court's error, we must determine the trial court's duty, if any, to control the admission of hearsay testimony into evidence,[6] in the absence of an objection by defendant's trial counsel.[7]

■ In making this determination, the following considerations are relevant:

This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.

*State v. Vanstory,* 91 Hawai'i at 42, 979 P.2d at 1068 (quoting *State v. Kelekolio,* 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993)).

■ "[M]atters presumably within the judgment of counsel, like *trial strategy,* will rarely be second-guessed by judicial hindsight." *State v. Richie,* 88 Hawai'i 19, 39–40,

---

6. Such control could occur (a) when the hearsay evidence is presented, or (b) after it is presented and before the court makes its decision on the merits.

7. Concerning (a) the admission or rejection of evidence, and (b) the giving of or refusing to give an instruction to the jury, HRS § 641–16 *(1993)* states, in relevant part, that:

... Except as otherwise provided by the rules of court, there shall be no reversal for any alleged error in the admission or rejection of evidence or the giving of or refusing to give an instruction to the jury unless such alleged error was made the subject of an objection noted at the time it was committed or brought to the attention of the court in another appropriate manner.

Concerning jury instructions, notwithstanding the part of HRS § 641–16 quoted above, the Hawai'i Supreme Court concluded in *State v. Pinero,* 75 Haw. 282, 291–93, 859 P.2d 1369, 1374–75 (1993), that, based on HRPP Rule 52(b), "[w]here an erroneous instruction affected the substantial rights of a defendant, however, [the appellate court] may notice the error as 'plain error' and remand for corrective action." In 1998, the Hawai'i Supreme Court changed this discretionary option into a mandatory duty described as follows:

"When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." [*State v.*] *Arceo,* 84 Hawai'i [1,] 11, 928 P.2d [843,] 853 (citations and internal quotation marks omitted); see also *State v. Kupau,* 76 Hawai'i 387, 393, 879 P.2d 492, 498 (1994). If the instructions requested by the parties are inaccurate or incomplete but are necessary "in order for the jury to 'have a clear and correct understanding of what it is that they are to decide [,]' " then the trial court has the duty either to correct any defects or to fashion its own instructions. *State v. Okumura,* 78 Hawai'i 383, 411, 894 P.2d 80, 108 (1995) (citations omitted); accord *State v. Kinnane,* 79 Hawai'i 46, 50, 897 P.2d 973, 977 (1995).

... Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. *State v. Robinson,* 82 Hawai'i 304, 310, 922 P.2d 358, 364 (1996). If that standard is met, however, "the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal." *Pinero,* 75 Haw. at 292, 859 P.2d at 1374. Whether a jury instruction accurately sets forth the relevant law is a question that this court reviews de novo. *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 504, 880 P.2d 169, 179 (1994).

*State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998).

In other words, even if defense counsel requests or does not object to erroneous instructions, that request or failure to object is not prejudicial to the defendant because the trial court "has the duty" to "correct any defects or to fashion its own instructions" so that, "when read and considered as a whole, the instructions given are [not] prejudicially insufficient, erroneous, inconsistent, or misleading." Now that this duty has been imposed on the trial court, it is logical to conclude that erroneous instructions should be examined for HRPP Rule 52(a) "harmless error" rather than HRPP Rule 52(b) "plain error."

960 P.2d 1227, 1247–48 (1998) (internal quotation marks and citation omitted; emphasis in original).

 Generally, at trial, absent an objection by the defendant to the hearsay testimony offered by the prosecution, the court lacks sufficient information to decide that its failure to preclude admission of the hearsay testimony into evidence, or to strike it after it has been admitted into evidence, is a plain error.

 When defendant's trial counsel does not exercise his right to object to inadmissible hearsay evidence offered by the prosecution, and "the record is unclear or void as to the basis for counsel's actions [or inactions], counsel shall be given the opportunity to explain his or her actions [or inactions] in an appropriate proceeding before the trial court judge." *Briones v. State*, 74 Haw. 442, 463, 848 P.2d 966, 977 (1993) (citation omitted).

Generally, such an opportunity to explain is best provided in a post-conviction proceeding initiated by the defendant, pursuant to HRPP Rule 40 (2004) which states, in relevant part, as follows:

**POST–CONVICTION PROCEEDING.**

(a) **Proceedings and Grounds.** The post-conviction proceeding established by this rule shall encompass all common law and statutory procedures for the same purpose, including habeas corpus and coram nobis; provided that the foregoing shall not be construed to limit the availability of remedies in the trial court or on direct appeal. Said proceeding shall be applicable to judgments of conviction and to custody based on judgments of conviction, as follows:

(1) FROM JUDGMENT. At any time but not prior to final judgment, any person may seek relief under the procedure set forth in this rule from the judgment of conviction, on the following grounds:

(i) that the judgment was obtained or sentence imposed in violation of the constitution of the United States or of the State of Hawai'i;

. . .; or

(v) any ground which is a basis for collateral attack on the judgment.

In the case of Fields, in light of these considerations, we conclude that the trial court did not violate a duty not to admit inadmissible hearsay testimony into evidence or a duty to strike inadmissible hearsay testimony after it was admitted into evidence. There being no error, there is no plain error.

F. Sufficiency of the Evidence.

 Fields contends that (1) "[t]he prosecution cannot rely exclusively on hearsay, whether admissible or not, to meet its burden to establish the *corpus delicti* of the offense." In fact, he is referring to the *corpus delicti* rule, which concludes that a defendant cannot be convicted when there is no proof a crime occurred other than his or her own earlier utterances. *People v. Chan*, 20 Cal.Rptr.3d 359, 366 (Cal.App. 2 Dist. 2004). In this case, in light of the record, we conclude that this rule is not relevant.

Based on his assumption that the evidence of Melinda's statement and Karma's statement should and would be stricken, Fields asserts that the trial court erred because there was insufficient evidence at trial to convict him. In light of our decision, this assertion is moot.

CONCLUSION

Accordingly, we affirm the October 11, 2002 Judgment without prejudice to appellant's right to attempt to prove, in a post-conviction/appeal proceeding pursuant to HRPP Rule 40, that his trial counsel's failure to object to the evidence of Melinda's statement and Karma's statement caused him to be the victim of the ineffective assistance of his trial counsel.